AO 91 (REV.5/85) Criminal Complaint					AUSA Stephen Chahn Lee (312) 353-4127

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SETH GILLMAN

CRIMINAL COMPLAINT

CASE NUMBER: 14 CR 33

FILED
JAN 2 4 2014
JAN 24 2014
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
MAGISTRATE JUDGE KIM

14 cr 33

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

### Count One

Beginning no later than August 2008 and continuing until January 2012, at Lisle, in the Northern District of Illinois, Eastern Division, and elsewhere, SETH GILLMAN, defendant herein:

> did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain money owned by and under the custody and control of Medicare by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items, and services, and, on or about October 14, 2009, did execute the scheme by knowingly and willfully submitting and causing to be submitted a false claim, specifically, that services provided to Patient DB beginning on October 1, 2008 through October 15, 2008 qualified for reimbursement at an elevated level of hospice care,

in violation of Title 18, United States Code, Section 1347.

### Count Two

On or about September 8, 2009, at Lisle, in the Northern District of Illinois, Eastern Division, and elsewhere, SETH GILLMAN, defendant herein:

> did endeavor to influence, obstruct, and impede a Federal auditor in the performance of official duties relating to a program receiving in excess of $100,000, directly or indirectly from the United States in any 1 year period, by submitting and causing to be submitted to a federal auditor, namely, TrustSolutions, a file for Patient DB that had been altered so that it would appear that Passages' claim for an elevated level of hospice care regarding Patient DB was justified,

in violation of Title 18, United States Code, Section 1516.

I further state that I am a Special Agent with the Department of Health and Human Services, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
WILLIAM LUCZAK
Special Agent, Department of Health and Human Services

Sworn to before me and subscribed in my presence,

January 24, 2014
Date

At Chicago, Illinois
City and State

YOUNG B. KIM, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

| | |
|---|---|
| UNITED STATES DISTRICT COURT | ) |
| | ) ss |
| NORTHERN DISTRICT OF ILLINOIS | ) |

### AFFIDAVIT

I, William Luczak, being duly sworn, state as follows:

1. I am a Special Agent with the Department of Health and Human Services, Office of Inspector General, specifically in the Inspector General's Office of Investigations. I have been so employed since 2001.

2. As part of my duties as a Special Agent, I investigate criminal violations relating to Medicare and Medicaid, including health care fraud. Through my training and experience, I have become familiar with the methods by which individuals and entities conduct health care fraud and the tools used in the investigation of such violations, including consensual monitoring, surveillance, data analysis, and conducting interviews of witnesses, informants, and others who have knowledge of fraud perpetrated against Medicare and Medicaid. I have participated in the execution of multiple federal search warrants. Along with other federal agents, I am responsible for the investigation of Passages Hospice.

3. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

### I. BASIS AND PURPOSE OF AFFIDAVIT

4. As explained in greater detail herein, there is probable cause to believe that beginning no later than August 2008 and continuing to January 2012, SETH GILLMAN did

1

knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain money owned by and under the custody and control of Medicare by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items, and services, and, on or about October 14, 2009, did execute the scheme by knowingly and willfully submitting and causing to be submitted a false claim, specifically, that services provided to Patient DB beginning on October 1, 2008 through October 15, 2008 qualified for reimbursement at an elevated level of hospice care, in violation of Title 18, United States Code, Section 1347.

5.   In addition, on or about September 8, 2009, with intent to deceive and defraud the United States, GILLMAN did endeavor to influence, obstruct, and impede a Federal auditor in the performance of official duties relating to a program receiving in excess of $100,000, directly or indirectly from the United States in any 1 year period, by submitting and causing to be submitted to a federal auditor, namely, TrustSolutions, a file for Patient DB that had been altered so that it would appear that Passages' claim for an elevated level of hospice care regarding Patient DB was justified, in violation of Title 18, United States Code, Section 1516.

6.   The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support a criminal complaint, I have not included each and every fact known to me concerning this investigation.

## II.   SUMMARY OF INVESTIGATION

7.   The Federal Bureau of Investigation and the Department of Health and Human Services are investigating SETH GILLMAN, Individual A, and other individuals associated with

2

Passages Hospice, a company that deployed nurses to provide hospice care at nursing homes and other facilities throughout Illinois. As described in detail below, the investigation has revealed that GILLMAN, Individual A and others have been and are engaged in a scheme to defraud Medicare and Medicaid by submitting and causing to be submitted false claims for hospice care, namely, claims indicating that the visits were justified.

8. Among other things, and as described more below, agents and law enforcement officials have interviewed more than 30 former and current employees of Passages, including several who reported Passages' billing and marketing practices to Medicare and/or law enforcement prior to being contacted by law enforcement. Several former employees, including Individual B, Individual C, and Individual D, may have a financial interest in the government's investigation. Based on checks of criminal-history databases, none of the individuals who have been interviewed and whose statements are described below have any felony convictions or any convictions involving false statements or dishonesty.

9. Agents and law enforcement officials have also reviewed emails and documents that were provided by Passages in 2011 in response to a civil investigative demand, as well as emails and documents that were obtained by law enforcement in executing a search warrant in January 2012.

10. Agents and law enforcement officials have also reviewed patient files that were provided by Passages in response to audit requests, patient files that were obtained during the January 2012 search, and patient files that were provided by Passages in response to subpoenas in 2013 and 2014. Agents also have interviewed patients, family members, and former medical directors.

11. Agents and law enforcement officials have also reviewed and analyzed claims data provided by TrustSolutions and Cahaba, which are both contractors which work to protect the integrity of the Medicare program, and by the Illinois Department of Healthcare and Family Services Office of Inspector General regarding claims submitted by Passages to Medicaid.

### III. MEDICARE BACKGROUND INFORMATION

12. Medicare is a health care benefit program within the meaning of 18 U.S.C. § 24(b). Medicare provides free or below-cost healthcare benefits to certain eligible beneficiaries, primarily persons sixty-five years of age or older. Individuals who receive Medicare benefits are often referred to as Medicare beneficiaries.

13. Medicare consists of four distinct parts: Part A provides hospital insurance coverage for inpatient hospital services, skilled nursing care, and home health and hospice care; Part B provides supplementary medical insurance for physician services, outpatient services, and certain home health and preventive services; Part C is a private plan option for beneficiaries that covers all Part A and B services, except hospice; and Part D covers prescription drug benefits.

14. Part A coverage, including hospice care, is paid for by the Federal Hospital Insurance Trust Fund. According to the 2010 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, the Federal Hospital Insurance Trust Fund had approximately $225 billion in revenue in calendar year 2009, including approximately $191 billion from payroll taxes, approximately $15 billion from interest credited from investments in government securities held by the fund, and approximately $1.9 billion in transfers from the general fund of the Treasury.

15. The Centers for Medicare and Medicaid Services, a federal agency within the United States Department of Health and Human Services, administers the Medicare program.

4

CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions. In order to promote the integrity of the Medicare program, in 2009, CMS contracted with TrustSolutions, a program safeguard contractor that concentrated on, among other things, fraud and abuse detection and deterrence, and conducted an audit referenced below.

16.     The Medicaid program is a federally-assisted grant program that enables states to provide medical assistance and related services to needy individuals. At the federal level, the Center for Medicare and Medicaid Services administers the Medicaid program. However, within broad federal guidelines, participating states determine who is eligible for Medicaid, the services covered, reimbursement levels for services, and administrative procedures. The State of Illinois, acting through the Department of Healthcare and Family Services, administers the Grants to States for Medical Assistance Programs pursuant to Title 42, United States Code, Section 1396. The Illinois Department of Healthcare and Family Services, which receives 50 percent of its funding from the federal government, reimburses medical institutions, including hospices, for reimbursable costs.

17.     According to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services website and Section 1861 of the Social Security Act, codified at 42 U.S.C. § 1395x, "hospice care" is defined as the provision of specified items or services—such as doctor and nursing care, certain medical equipment and supplies, certain drugs for pain or symptoms, home health aide services, therapy, social work and counseling, and short-term inpatient stays—to a patient who is "terminally ill." According to the Medicare Benefit Policy Manual, to be considered "terminally ill," a beneficiary must be certified by the Medical Director of the hospice provider—who must be a registered nurse or physician—as well

as the patient's attending physician as having a terminal prognosis with a life expectancy of six months or less if the disease runs its normal course.

18. According to the Medicare Benefit Policy Manual, once a patient elects to receive hospice care and is certified as terminally ill, the individual may receive hospice care for 90 days before being recertified for an additional 90 day period of hospice care, and after the initial 180 days must be recertified as terminally ill every 60 days. Upon a beneficiary's election of hospice care, the hospice agency assumes the responsibility for medical care related to the beneficiary's terminal illness; the care is palliative rather than curative, and the patient must waive all rights to Medicare payments for treatment of the terminal illness.

19. According to the Medicare Claims Processing Manual, Medicare pays hospice providers a set daily rate based on the geographic location of the patient and level of care provided to the patient. There are four levels of care at which Medicare reimburses hospice providers. The two levels that are particularly relevant to this investigation are routine care and general inpatient care (sometimes known as GIP); the two others are continuous home care and inpatient respite care. According to the Medicare Claims Processing Manual, the hospice provider is paid the routine care rate for each day the patient is under the care of the hospice and not receiving one of the other categories of hospice care, and is billed at the lowest rate.

20. According to the Medicare Benefit Policy Manual, general inpatient care is intended for "pain control" or "acute or chronic symptom management that cannot feasibly be provided in other settings." According to the manual, examples of appropriate general inpatient care include a patient who elects hospice at the end of a hospital stay and needs "pain control" or "symptom management" while preparing to receive hospice care, and "a patient in need of medication adjustment, observation, or other stabilizing treatment."

6

21. According to Medicare hospice Conditions of Participation 418.108 and 418.110, Title 42, Code of Federal Regulations, Sections 418.108 and 418.110, for inpatient care to be provided in a nursing facility, the nursing facility must provide 24-hour nursing services that meet the nursing needs of its patients. Moreover, if a patient is receiving general inpatient care, then each shift at the nursing facility must have a registered nurse who provides direct patient care.

22. According to a compliance tip sheet by the National Hospice and Palliative Care Organization (last accessed online on January 18, 2014 at http://www.nhpco.org/sites/default/files/public/regulatory/GIP_Tip_GIP_Sheet.pdf), GIP is a "valuable tool that allows hospice staff to provide clinical services to a degree that cannot typically be provided in a patient's home. It is intended for specific circumstances and for a short duration of time and thus must be carefully managed from start to finish." The tipsheet identifies some examples of patient conditions that may warrant providing GIP to a patient:

- ✓ Pain or symptom crisis not managed by changes in treatment in the current setting or that requires frequent medication adjustments and monitoring
- ✓ Intractable nausea/vomiting
- ✓ Advanced open wounds requiring changes in treatment and close monitoring
- ✓ Unmanageable respiratory distress
- ✓ Delirium with behavior issues
- ✓ Sudden decline necessitating intensive nursing intervention
- ✓ Imminent death – **only** if skilled nursing needs are present

7

23. Common Procedural Terminology codes, also known as CPT codes, are written by the American Medical Association and published yearly. The AMA codes book is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians. The purpose of the terminology is to provide a uniform language that accurately describes medical, surgical, and diagnostic service. CPT codes are widely accepted by insurance carriers and Medicare as effective means for reporting the performance of medical, surgical, and diagnostic services. In 2000, the CPT code set was designated by the Department of Health and Human Services as the national coding standard for physician and other health care professional services and procedures under the Health Insurance Portability and Accountability Act.

24. According to the Medicare Claims Processing Manual, Chapter 11: Processing Hospice Claims, the various levels of hospice care are billed under the following CPT codes: 0651 (Routine Home Care); 0652 (Continuous Home Care), 0655 (Inpatient Respite Care), and 0656 (General Inpatient Care).

25. According to the Medicare Claims Processing Manual, the daily reimbursement rate for general inpatient care is significantly more than for routine home care—*e.g.* from October 1, 2004, through September 30, 2005, general inpatient care paid a daily rate of $542.61 compared to $121.98 for routine care; those rates rose to $671.84 and $151.23, respectively, for the 2012 fiscal year.[1]

---

[1] According to the Medicare Claims Processing Manual, the number of days of inpatient care (both General Inpatient and Inpatient Respite) furnished by a hospice provider is capped at 20% of the total number of days of hospice care provided to all Medicare beneficiaries during the cap period (calculated from November 1 through October 31).

IV.  **PASSAGES OVERVIEW**

26.  According to provider enrollment records obtained from Medicare, Passages Hospice, LLC, provides hospice care to patients in Illinois and elsewhere and is an authorized Medicare provider. According to Passages promotional materials, GILLMAN started Passages in 2005 "to address the needs of the patients in the nursing homes."

27.  According to organizational charts and his signature line on emails, GILLMAN was the "Administrator" of Passages. According to Illinois Secretary of State records, GILLMAN is the agent for Passages and is also the agent for Asta Care Center of Bloomington, Asta Care Center of Colfax, Asta Care Center of Ford County, Asta Care Center of Pontiac, Asta Care Center of Rockford, and Asta Care Center of Toluca, each of which is a nursing home managed by Asta Healthcare Company, Inc. According to Illinois Secretary of State records, GILLMAN is the agent and secretary of Asta Healthcare Company, and GILLMAN's father is the president. As noted below, many Passages hospice patients were at Asta facilities when referred to Passages.

28.  According to a 2009 operating agreement, GILLMAN and his father were two of the four members of Passages Hospice, LLC, with each member having a 25 percent ownership share. According to their signatures in emails with GILLMAN, the other two members were vice presidents at Asta Healthcare Company as of 2010.

29.  In a July 8, 2010 email, GILLMAN described himself as a "masters level health care attorney in practice since 1993." According to the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois's website, GILLMAN was admitted as a lawyer by the Illinois Supreme Court in 1993 and whose registered business address is the office of Passages.

30. Passages had offices in Lisle, Illinois. As the company grew, it divided its operations into several geographic-based regions, with different nurses, nursing directors, and medical directors for each region. According to documents and interviews, Region B covered Chicago and the western suburbs, Region C covered Rockford, Region D covered Bloomington, and Region F covered Belleville, Illinois.

31. Passages did not have its own facility for its hospice patients, but instead deployed nurses to visit patients, typically in the nursing home where they had already been residing, as well as at patients' homes. By contrast, according to statistics from the National Hospice and Palliative Care Organization, in 2009, approximately 40 percent of hospice patients received care in their home and 21 percent in a hospice facility, with only 18.9 percent receiving care in a nursing home.

32. According to interviews, as well as a review of emails and documents, Passages received referrals from physicians and nursing homes for patients who allegedly wanted hospice services. When a patient was referred to Passages, a Passages nurse evaluated the patient for admission to hospice care. If the nurse believed that the patient qualified, then one of Passages' medical directors was asked to certify the patient for admission. However, as discussed below, medical directors sometimes were not consulted about an admission prior to the patient being admitted, and were asked to sign paperwork indicating that the director had approved the admission only afterwards. In addition, GILLMAN caused some patients to be admitted to hospice care even when a medical director did not believe that the patient was eligible for hospice care or when the patient was unaware that Passages provided hospice services.

33. According to interviews, as well as a review of emails and documents, once the patient was admitted, Passages nurses regularly visited patients, who often were at nursing home

10

facilities. Nurses typically visited patients twice a week if the patient was on the routine level of care and were supposed to visit patients every day if the patient was on general inpatient care. Pursuant to Medicare regulations, Passages employees met to discuss their patients in meetings which were referred to as "interdisciplinary team" or "interdisciplinary group" meetings, often referred to as IDT or IDG meetings. Passages medical directors often attended these meetings and were asked to certify admissions and changes in level of care, as well as to recertify patients for continued hospice care. Passages medical directors typically did not see patients themselves and relied on nurses for information about patients' conditions.

34. Beginning in or around late 2008, according to interviews, as well as a review of documents, and emails, GILLMAN trained and caused to be trained Passages nurses to look for signs that allegedly would qualify a patient for GIP, and thus higher payments per day (see paragraphs 53-56). GILLMAN knew that many of Passages' patients were improperly being placed on GIP, in part as a result of an August 2009 review of patient files, a September 2009 report by an outside consultant, and a September 2010 internal audit (see, e.g., paragraphs 53-56, 83-87, 113-20, 128, 170-71, 183). GILLMAN also knew that patients had been put on GIP without a medical director's approval at the time (see paragraphs 93-96, 168).

35. Individual A was the administrator of Passages along with GILLMAN as of 2011, and shared a joint email address with him in 2011. Individual J was the nursing director of the Passages region covering Chicago and the west suburbs in 2009 and 2010, and then became the director of clinical services beginning in 2010.

V.   **PASSAGES' PATIENT POPULATION**

36. Based on a review of claims data, emails, and interviews with patients and family members, as well as a review done by a consultant retained by the government, Passages' patient

11

population included many patients who received hospice care from Passages for long stays, many patients who did not have illnesses that are typically considered terminal, and many patients who were placed on general inpatient care for long periods and without justification.

37. According to Medicare claims data, Passages had many patients who received hospice care from Passages for an extended period of time, inconsistent with the certifications that the patients had a life expectancy of six months or less at the time of admission. According to claims data, approximately 22 percent of Passages' patients between January 2006 and October 2011 had more than 180 days of hospice care, with approximately 28 patients receiving more than 1,000 days of hospice care in that period. By contrast, 11.8 percent of hospice patients in 2009 were on hospice for longer than 180 days for the members of the National Hospice and Palliative Care Organization, according to that organization's Facts and Figures: Hospice Care in America edition for 2010.

38. For example, according to claims data, Passages billed for more than 2,000 days of hospice services for Patient JW. According to Patient JW's daughter, Patient JW had a major stroke in 2003 and was on "life support" for some time. He went to a rehabilitation center to recover. Patient JW was then admitted to one of the Asta nursing homes in 2003 when he did not respond to rehabilitation. According to Patient JW's daughter, she got a call from someone at either Passages or Asta recommending hospice care so that Passages could give "more care" than the nursing home could provide.

39. According to Patient JW's daughter, at the time of Patient JW's admission to Passages, his condition was chronic and stable, with no imminence of death. When told that hospice patients needed to be certified as having a life expectancy of six months or less, Patient

JW's daughter said that no one ever told her that this was Patient JW's prognosis. Patient JW said that she recalled wondering why her father was being put in hospice.

40. Another long-term patient was Patient LJ. According to claims data, Passages submitted bills for approximately 1,443 days of hospice services for Patient LJ. According to Patient LJ's son, Patient LJ was admitted to Asta Care nursing home in or around May 2001. According to Patient LJ's son, after Patient LJ was admitted to Asta, the staff at Asta suggested to him that Patient LJ see a doctor who visited Asta Care. Patient LJ's son said that Asta referred Patient LJ to hospice, and that no one explained the Medicare hospice benefit to him.

41. When told that Passages had billed approximately 1,443 days of hospice care for Patient LJ, Patient LJ's son said that the he thought that hospice was intended to make people "comfortable" as they were on the "verge of passing." Patient LJ's son said that Patient LJ had dementia but was "not in bad shape" and had "no imminent danger of dying" until the last month of her life, and added that "if [Medicare] got billed for anything more than 50 to a hundred days, [Medicare] got stiffed."

42. Based on a review of claims data, Passages' patient population changed over time, with many new admissions based on dementia, "unspecified debility," and "adult failure to thrive," rather than diagnoses involving cancer. Based on claims data, cancer-related diagnoses comprised about 24 percent of the admissions in 2006, falling to 10 to 12 percent in 2009 through 2011, while dementia went from 3 percent of admissions in 2006 to 50.1 percent in 2011.[2] By contrast, cancer-related diagnoses made up 40.1 percent of hospice admissions in

---

[2] This review was done based on the separate admissions shown in the claims data. In some instances, a patient was discharged and then re-admitted, and would thus show up as having two or more separate admissions. According to claims data, from 2006 through October

13

2009 for the members of the National Hospice and Palliative Care Organization, according to that organization's Facts and Figures: Hospice Care in America edition for 2010.



43. Based on claims data, the amount of GIP that Passages billed in its claims to Medicare grew significantly beginning in 2008. According to claims data, and as shown in the graph below, Passages had an average of approximately 7.1 percent of its patient population on GIP per day from July 2008 through September 2011, with a high of 14.75 percent on one day in July 2009. By contrast, the percentage of patient care days for general inpatient care in 2009 was 2.9 percent for members of the National Hospice and Palliative Care Organization, according to that organization's Facts and Figures: Hospice Care in America edition for 2010.

---

2011, approximately 583 patients were admitted more than once, with one patient admitted to hospice care six times, initially with diagnoses of "unspecified" congestive heart failure and then was admitted three later times with dementia, "unspecified debility," and "senility without mention psychosis."

14



% patients on GIP per day

44. According to a review of Medicare claims data, Passages billed Medicare an average of approximately 7 GIP patient days per month between January 2006 and June 2008, with a high of approximately 26 GIP patient days in one month. Beginning in July 2008, Passages billed significantly more GIP patient days per month. Passages billed approximately 1,161 GIP patient days to Medicare a month in 2010, and billed approximately 1,430 GIP patient days a month from January 2011 through September 2011.[3]

|  | June 2006 – June 2008 | July 2008 – Dec. 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Average # GIP patient days per month | 7 | 94 | 619.3 | 1,161 | 1,430 |
| Average total GIP payments per month | $4,437 | $59,331 | $397,997 | $751,917 | $946,743 |

---

[3] Claims data includes the date that GIP service began and the approximate number of days that the GIP period continued, which was 4 days or less approximately 83 percent of the time. For purposes of the review of claims data, GIP was measured by the month that the GIP service began. For example, if a GIP period began on September 30, 2010 and continued for five days, it is counted for purposes of this analysis as beginning in September 2010 rather than in October 2010.

15

45.     The graph below shows the approximate number of GIP patient days per month, based on a review of claims data:



46.     The graph below shows the approximate total amount of GIP payments that Passages received for the GIP it billed in a given month, based on a review of claims data:



47.     The government retained a hospice physician who is an expert in the areas of Medicare hospice eligibility and GIP medical necessity to perform a comprehensive review of Passages' patient files, and is paying the expert based on an hourly rate. The government